## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

BEVERLY H. ACTON,

     *Plaintiff*,

*v.*                                                  CASE NO. 4:13-CV-14249

CAROLYN W. COLVIN                    DISTRICT JUDGE TERRENCE G. BERG
Commissioner of Social Security,       MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's decision. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, Defendant's Motion for Summary Judgment be **DENIED**, and the case be remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI of the Social Security Act 42 U.S.C. §§ 1381-1383f and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401-34. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 13.)

Plaintiff Beverly Acton was thirty-nine years old on July 1, 2001, the date she alleges her disability began. (Transcript, Doc. 8 at 165, 172.) She has worked in the real estate and insurance industries. (Tr. at 213.) On June 3, 2011, Plaintiff filed the present claims for SSI and DIB. (Tr. at 165, 172.)

The claims were denied at the initial administrative stage. (Tr. at 73, 74, 98, 99.) In denying the claims, the Commissioner considered "affective/mood disorder" and migraines. (*Id.*) On January 3, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Paul W. Jones, who considered the application for benefits de novo. (Tr. at 24-52.) In his decision issued on February 15, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 10, 18.) Plaintiff requested a review of this decision on April 19, 2013. (Tr. at 6.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 8, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On October 7, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.)

## B.    Standard of Review

The Social Security system contains a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations for substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The

Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting

*Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

4

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.      Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353); *accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who

have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means

inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes

a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d

at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by her impairments and the fact that she is precluded from performing her past

6

relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

The ALJ found at step one that Plaintiff met the insured status requirements through December 31, 2006, and had not engaged in substantial gainful activity since July 1, 2001, the alleged onset date. (Tr. at 12.) At step two, the ALJ concluded that Plaintiff had the following medically determinable impairments: "headaches, spinal aches, affective disorder, [and] obesity . . . ." (*Id.*) None of these were severe, the ALJ found, rendering the remaining steps of the analysis unnecessary. (Tr. at 12-13.)

**E.    Administrative Record**

1.    Medical Records

Plaintiff's record begins with a visit to the emergency room on November 30, 1999 after experiencing abdominal pain. (Tr. at 252.) The pain came from acute cholecystitis and required a cholecystectomy to correct, which was performed the next day. (Tr. at 250-52.) The surgery was successful and she was discharged a few days later. (Tr. at 252.)

After four months of persistent headaches, Plaintiff obtained a Doppler study of her carotid vessels in November 2001. (Tr. at 257.) The results were normal, with only "minimal intraluminal

thickening . . . ." (*Id.*) The headaches continued over the next year, leading her to see Dr. Orlando Florete at a pain clinic in January 2003. (Tr. at 289.) Nausea and regurgitation accompanied the headaches "once every six weeks." (*Id.*) Stress, exercise, and neck issues seemed to bring about the headaches; medication and sleep eased the pain. (*Id.*) A previous string of headaches in 1994, lasting a few weeks, was alleviated by chiropractic treatments. (*Id.*) She bounced around to various doctors before coming to the clinic, including a neurologist and a medication management consultant, to no avail. (*Id.*) Her list of attempted, but usually fruitless treatments was lengthy, everything from "trigger point injections, acupuncture, epidural injections, psychological counseling . . . , relaxation biofeedback" and "atlas orthogonal treatments." (*Id.*) The latter cut the pain by forty-percent. (*Id.*)

A computerized tomography ("CT") scan in Plaintiff's record, reviewed by Dr. Florete at the appointment, was "negative," as was an electromyogram ("EMG"). (*Id.*) Plaintiff added that she had received prescriptions and one doctor performed occipital nerve blocks, which sometimes provided significant but temporary relief. (*Id.*) Reviewing her systems, such as the respiratory and cardiovascular, Dr. Florete noted that Plaintiff denied any disorders or difficulties except "joint stiffness, pain, and swelling, neck pain,  and back pain," and mood disorder. (Tr. at 290.)

Dr. Florete then conducted a physical examination. (Tr. at 291.) He observed spasms and tenderness in her neck and "minimal tenderness" in her trapezius. (*Id.*) Additionally, "There is minimal restricted range of motion on lateral bending." (*Id.*) Otherwise, she appeared unexceptional, adequately strong with normal gait and sensation. (*Id.*) He diagnosed "[h]eadache of mixed etiology," although what that mix consisted of he did not seem to know, sending her for a magnetic resonance imaging ("MRI") study. (*Id.*) He believed, however, that her medications,

which he continued to prescribe, would be increasingly unnecessary "once the cervical blockade [could] be performed . . . ." (*Id.*) More than this would be needed: "It is likely that this patient will undergo either cervical facet joint injections at [numerous disc levels] . . . and/or atlantoaxial joint injections bilaterally with a possible selective nerve root block at the [disc] level of C2." (Tr. at 292.)

The MRI results returned in early February showing a protruding disc at level C4-5 that impinged the thecal sac, and a protruding disc at C6-7. (Tr. at 247.) Plaintiff saw Dr. Roberto Saucedo on March 20 to receive cervical epidural steroid injections. (Tr. at 248.) He reviewed her prescriptions, tweaking some and cancelling one, Percocet, that he believed she had "become dependent on" and which could cause rebound headaches. (*Id.*)

Returning to Dr. Florete later that month, she informed him that some of the medication changes he had made helped, even significantly, while others did not. (Tr. at 293.) He provided refills and set up cervical facet injections "along with the possibility of sphenopalatine block . . . ." (Tr. at 293.) The procedures occurred sometime before the next recorded appointment, on March 26, and Plaintiff then reported they were unsuccessful. (Tr. at 295.) Her temples were tender, the pain rating at level seven-out-of-ten on a visual analog ("VA") scale. (*Id.*) She received more injections and, this time, she reported immediate relief. (*Id.*) Dr. Florete noted her longtime use of opiates and posited that they caused the "rebound headaches." (*Id.*) Plaintiff did not want to discuss this possibility and instead opted for a prophylaxis treatment including Topamax. (*Id.*)

A few days later Plaintiff arrived at the Jacksonville Surgery center "to undergo right cervical medial nerve branch blocks of the facets." (Tr. at 297.) She was in the recovery room, hooked up to an intravenous apparatus, before the procedure when Dr.Saucedo came in to examine

her neck, which she said did not hurt. (*Id.*) Then commenced an inexplicable scene. As Dr. Saucedo was talking, Plaintiff refused to look at him, exclaiming that doing so would make her "angrier." (*Id.*) Out flew explicitives levied at the doctor and his staff for failing to fix her pain and answer her questions promptly. (*Id.*) Her declamation swelled with threats of lawsuits, at which point Dr. Saucedo informed her that he "would not touch her in any way or do any procedures on her." (*Id.*) The swearing continued as the staff removed the intravenous tubes and she was eventually discharged.[2] (*Id.*)

Plaintiff saw Dr. Badri N. Mehrotra throughout the rest 2003 and into 2004. (Tr. at 263-68.) She reported in July that her condition was worsening, but Dr. Mehrotra's examination did not uncover abnormalities. (Tr. at 266-68.) In May, however, he found that her neck was tender and diagnosed disc disease. (Tr. at 265.) By the July appointment, the neck pain apparently had ceased, as the notes do not indicate abnormal findings aside from headaches. (Tr. at 264.) During the next session, in December, Plaintiff complained of head and neck pain, but the examination report indicates that her neurological and musculoskeletal systems were normal. (Tr. at 263.) The results were again normal in January 2004, and Dr. Mehrotra agreed to continue temporarily providing medication because Plaintiff struggled to find a pain management physician. (Tr. at 262.)

Plaintiff began seeing Dr. Timothy L. Sternberg at the start of 2004. (Tr. at 299.) She rated her pain at four-out-of-ten on a VA scale, describing it as constant, sometimes throbbing, relieved only by sleep and medication. (*Id.*) The cause had eluded numerous specialists, Dr. Sternberg wrote, but a few tentative diagnoses had been offered: pseudotumor cerebri, pituitary

_____

[2] At the administrative hearing, she explained that her outbursts resulted from extreme pain: she could not take medications the night before the surgery, but when she arrived on time the next morning the doctor had an emergency, forcing her to wait hours without being able to take anything for the pain. (Tr. at 35-36.)

microadenoma, and "questionable" multiple sclerosis. (*Id.*) She reported her neck, back, and joint pain, as well as irritability and depression. (Tr. at 300.) Dr. Sternberg could not find any abnormalities aside from mild tenderness on Plaintiff's scalp, nor did he discover anything amiss in the available diagnostic reports. (Tr. at 300-01.) He offered potential diagnoses: analgesic rebound, depression, cerebrospinal fluid leak, and "unidentified inflammatory reaction[s] . . . ." (Tr. at 301.) He sketched various treatment plans, contingent on additional future tests. (Tr. at 301-02.)

Before her next visit, on January 21, she consulted with a neurologist at Dr. Sternberg's recommendation. (Tr. at 303.) Discussing the neurologist's findings later, Dr. Sternberg wrote in his treatment notes that multiple sclerosis seemed unlikely. (*Id.*) Plaintiff's physical condition was "unchanged," and she "seem[ed] to be very concerned in trying anything that will help her." (*Id.*) Anything, that is, but continue the "analgesic free period" testing whether she was experiencing rebound headaches from opioids. (Tr. at 305.)

In April, however, Dr. Sternberg reported that he had "weaned her off opiods for six weeks" without any change in her headaches. (Tr. at 306.) The medications he tried were likewise unsuccessful. (*Id.*) Her pain had decreased since using the opioids, she claimed. (*Id.*) He concluded that her pain was adequately treated with Fentanyl patches, and he also planned nerve block procedures. (*Id.*) In May, she informed Dr. Sternberg that the patches improved the pain by eighty percent and helped to increase her ability to complete "activities of daily living . . . ." (Tr. at 307.) They decided to continue the medications and seek approval for nerve blocks and injections. (*Id.*)

Dr. Mehrotra continued prescribing medications for her pain in May 2004 even after she reported seeing a pain management specialist. (Tr. at 260.) Her examination was again

unremarkable. (*Id.*) In February 2005, she had depression and unexplained abnormal findings in her musculoskeletal system. (Tr. at 259.) Her examination results returned to normal during her final session with Dr. Mehrotra, in July 2005.

Dr. Lee Ann Manthorne examined Plaintiff in August 2005, noting the headaches and depression. (Tr. at 310-11.) Plaintiff claimed fatigue, nausea, vomiting, right shoulder pain, and depression. (Tr. at 311.) In the notes for the next visit, on September 14, 2005, Dr. Manthorne stated that Plaintiff saw a pain specialist who was "try[ing] to set her up at Duke University Medical Center for a study on occipital headaches." (Tr. at 312.) She denied nausea and vomiting, appeared alert, and her physical examination was normal. (*Id.*) Her next appointment, in October, proceeded similarly, except she also reported significant depression and admitted to increasing her anti-depressant dosage, which Dr. Manthorne advised against. (Tr. at 313-14.)

Plaintiff visited Dr. Jim Ledford, Ph.D., on November 2005 to discuss her headaches and depression. (Tr. at 308.) She had recently switched to a new anti-depressant, she explained, and now her depression worsened, though the medication was "helping for [the] most part." (*Id.*) He gave her samples for another anti-depressant. (*Id.*) The appointment with Dr. Ledford was Plaintiff's last with any doctor for almost six years, and she explained that she lacked the means to purchase prescription medications during that period. (Tr. at 221.)

The state agency handling the disability claim arranged for Dr. Diana Benton, Ph.D. to examine Plaintiff on August 10, 2011. (Tr. at 272.) Dr. Benton noted that Plaintiff drove alone to the session, arrived on time, and was cooperative throughout. (*Id.*) The headaches had continued unabated, Plaintiff explained, triggered by florescent lights, whiffs of stray pungent scents, or even simple stress. (*Id.*) The pain would have disrupted work in 2001, but it precluded it altogether by

2005, she said. (Tr. at 273.) Her depression led her to three different psychologists for counseling between 2003 and 2005, she claimed, but without success. (*Id.*) She checked into a drug rehabilitation center in 2005 for five days, which she found helpful because it forced her off of Fentanyl and Vicodan, but the hospital's harsh florescent lighting and cacophonous acoustics made continuing treatment there impossible. (*Id.*) She admitted that she abused prescription medications in the four years prior to her hospital stay. (Tr. at 274.)

She also discussed her capacities, stating she could handle personal care, cooking, driving short distances, and cleaning up after herself, but she did not do housework. (Tr. at 273.) Managing finances was also feasible unless it produced stress, in which case her mother helped. (*Id.*) Her social life was barren: she talked to her sister once per month. (*Id.*) And her daily activities were similarly sparse: she watched television and tried to read. (*Id.*) She had been married and divorced three times. (Tr. at 274.)

At the session, she wore a hat, to shield her eyes from lighting, a back brace, and an ace bandage around her right elbow. (*Id.*) Dr. Benton observed that her eye contact was "good" and her gait and posture were unremarkable. (*Id.*) She spoke normally, had logical and goal-orient thought processes, but appeared depressed, cried, reported considering suicide, admitted that she had attempted to kill herself twice in the early 2000s. (*Id.*) Her mental orientation was proper, and her cognition tests adequate or normal. (*Id.*) Dr. Benton concluded that Plaintiff had chronic, moderate depression and that her opioid dependence was in full remission. (Tr. at 275.)

Plaintiff's physical consultative examination occurred one month later. (Tr. at 276-82.) Dr. Amber Tas, the examiner, noted that Plaintiff claimed she generally tried to limit her movements, but could stand for five minutes, walk slowly for five minutes, and lift ten pounds. (Tr. at 277.)

The examination produced normal results, testing her nerves, reflexes, strength, and other systems. (Tr. at 277-78.) In particular, she had normal gait and could lift, carry, and handle light objects. (Tr. at 279.) She performed fine motor skills, squatted and rose with difficulty, got up and down from the exam table with "some difficulty," walked on her heels and toes and in tandem, and stood on one foot. (*Id.*) Her right leg had "mild weakness" likely due to herniated discs. (*Id.*) Dr. Tas could not find a "physical reason for the severity of her headaches . . . ." (*Id.*) Plaintiff's depression appeared severe and should be treated with counseling and medication. (*Id.*) Dr. Tas thought the depression was more critical to Plaintiff's health than her back pain, which as noted only produced slightly decreased strength in her right leg and also slightly limited her right shoulder's range of motion. (*Id.*)

Dr. Eric Wiener, Ph.D., examined Plaintiff for the state agency on September 27, 2011. (Tr. at 56-57, 66-67.) He observed that she had good eye contact, unremarkable posture, spoke normally, had logical thought processes, and normal gait. (Tr. at 56, 66.) She appeared depressed, cried, and admitted suicidal thoughts but denied any plans. (*Id.*) Her cognitive tests were normal. (*Id.*) He concluded that her psychological issues were secondary, presumably to her physical pain, and imposed only non-severe limitations. (Tr. at 57, 67.)

The final medical records come from visits to Dr. Gary L. Lynd, M.D. between July and December 2012. (Tr. at 283-88.) He changed her pain and psychotropic medications, but most of the handwritten results are difficult to decipher. (*Id.*) On October 24, the notes state that Plaintiff had normal gait and range of motion without pain. (Tr. at 285.)

14

## 2.      Evidence from the Application Forms and Administrative Hearing

Plaintiff worked at various jobs after the alleged disability onset date. (Tr. at 12.) She stated in her work activity report that she received residual income from houses she sold prior to that date. (Tr. at 186.) From August 2009 until January 2010, she work eight hours per day, at least five and perhaps seven days per week selling mobile homes, earning $250.00 per week.[3] (Tr. at 12, 191, 204, 277.) She had few customers, which allowed her to meditate during the day, which helped her pain; she quit when business grew too brisk. (Tr. at 239.) She was an insurance agent between 2001 and 2003, each week working forty-hours and earning $500.00. (Tr. at 204, 253.) She claimed elsewhere, however, that she did not see insurance clients on a regular basis and had to quit in 2003. (Tr. at 220.) In 2005 she tried to start a business with her sister but could not handle the work. (*Id.*) Her income was low enough during these periods, below the substantial gainful activity levels, that her work did not automatically preclude her from benefits. (Tr. at 12, 179-85.)

In a supplemental form she completed on July 19, 2011, she said her mother helped her cook, clean, shop, and finish the laundry. (Tr. at 224.) She could drive "some," and her sitting and standing were "ok," but she walked slowly. (Tr. at 225.)

A form completed on June 3, 2011, noted a recent initial denial of prior DIB claim. (Tr. at 199.) The denial came on April 14, 2008. (*Id.*) The form stated that the prior folder was located at PC7, but was not being requested for this claim. (*Id.*)

At the administrative hearing on January 3, 2013, Plaintiff testified that she lived with her sister since July 2012. (Tr. at 28-29.) She claimed to have recently started taking pain medication again, and that the pain was "getting better every day . . . ." (Tr. at 29.) Soon after the hearing

---

[3] Dr. Tas's notes state that Plaintiff's sales job ended in January 2009, (Tr. at 277), but Plaintiff wrote that she worked until January 2010. (Tr. at 191, 204.)

15

began, she started crying due to a headache, she explained. (Tr. at 30.) She also expressed concern that a panic attack might strike. (*Id.*) She had never been hospitalized for psychiatric reasons, she asserted, and none of the antidepressants seemed to work; she currently took medication for anxiety. (Tr. at 30-31.) She saw a counselor roughly a decade ago, though she could not remember when. (Tr. at 31-32.) Her health insurance expired in 2005 when it became too expensive to renew. (Tr. at 33.)

Her headaches prevented her from working, and also her hands and legs were numb and tingling. (Tr. at 35.) Plaintiff acknowledged that no one had found the cause of her pain, but at her attorney's prompting–"It's in your neck," he reminded her–she offered that "I think it's got to do with the subluxation from an accident from 1994 . . . ." (Tr. at 36-37.) She had scoured "natural stuff" remedies for relief, like meditation and acupuncture, and the former brought the pain down to level four on a VA scale, which "I can live with," she said. (Tr. at 37.)

Her crying persisted throughout the questioning and the ALJ asked again why she had trouble "maintaining control of [her] emotions." (Tr. at 38.) She responded that her headache was then at level six, "and if it gets to eight, I'll be in a panic. I'll have to go to [the] emergency room if I can't get it under control." (*Id.*)

Plaintiff's attorney took over the inquiry, first guiding her through a series of questions that spelled out her financial history: she made more money some years than others, and when she was last separated from her former husband in 2005, he gave her a large sum, and then a smaller but still substantial payment upon divorce in 2009. (Tr. at 39.) These payments provided her financial support until she ran out of money in 2011. (*Id.*) She tried selling mobile homes, but she often

16

could not work and needed to meditate to make it through the day. (Tr. at 40.) She set the pace for her work, stopping when she needed to rest. (Tr. at 42.)

They then discussed her past disability applications. In 2003 she filed a claim that was denied. (Tr. at 40.) In 2005 she filed another claim that was denied in March 2006 because the Commissioner concluded she could not return to her past work but could perform other jobs. (*Id.*) She intended to appeal but, as her attorney described, the Administration told her she could not appeal because her last insured date was in 2005, handing her "a paper note" to that effect and advising her to file another application. (Tr. at 41.) The unnamed staff member then told her she had too many assets to reapply for SSI. (*Id.*) When the topic came up again later, the ALJ interjected that Plaintiff's conversation with staff was "not really relevant to this claim . . . ." (Tr. at 49.) Her attorney said that the Administration's mistake "took away her right to an appeal," but the ALJ responded that "we're talking about whether or not she's able to work" now. (*Id.*) Undeterred, the attorney reminded Plaintiff that during her prior application process, someone at the Social Security office told her that her work during the alleged disability period was not substantial gainful activity. (Tr. at 49-50.)

The treatments, including numerous injections and medications, were ineffective. (Tr. at 43-44.) Her reliance on the prescription drugs led her to complete rehabilitation successfully, but without them the headaches were severe; she only recently started taking them again. (Tr. at 44.) She admitted, however, that no one ever suggested surgery was necessary. (Tr. at 50.) She was often reduced to staying in bed or on the couch all day. (Tr. at 45.) The hearing then ended, without testimony from a vocational expert. (Tr. at 52.)

**F.      Substantial Evidence**

The ALJ determined that from the alleged onset date through the time of the hearing, Plaintiff did not have a severe impairment or combination of impairments that significantly limited her ability to work. (Tr. at 12-13.)

**1.      Governing Law**

At step two of the five-step sequential evaluation process, if the claimant "does not have any impairment . . . which significantly limits [his or her] physical or mental ability to do basic work activities" the Commissioner will find that the claimant "does not have a severe impairment and [is] therefore, not disabled." 20 C.F.R. § 404.1520. The Commissioner does not consider vocational factors, that is, age, education, and work experience, at this step. 20 C.F.R. § 404.1520. Basic work activities include (1) physical functions such as walking and lifting; (2) visual, auditory, and verbal capacities; (3) mental functioning; (4) judgment; (5) ability to respond appropriately to communications; and (6) ability to deal with changes in the work setting. 20 C.F.R. § 404.1521(b).

In the Sixth Circuit, "the claimant's burden of proof at step two has been construed as a *de minimus* hurdle in the disability determination process . . . . [A]n impairment can be considered *not* severe only if it is a slight abnormality that *minimally* affects work ability regardless of age, education, and experience." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 774 (6th Cir. 2008) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *see also Yuckert*, 482 U.S. at 158-59. The second step, then, is a vehicle to "screen out totally groundless claims." *Farris v. Sec'y of Health and Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985); *see also Yuckert*, 482 U.S. at 153 (1987) ("The severity regulation increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight

18

that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account.").

### 2.   Analysis

Plaintiff's claim lacks strong support–the nearly six year block without treatment is troubling–but is not so weak that the ALJ could cast it aside at the second stage. He admirably condenses the record evidence, but his analysis is slim. In fact, after he describes the evidence, he fails to accord any critical scrutiny or comment to the physical "medically determinable impairments" he found above: headaches and spinal pain. (Tr. at 12.) The only time he even hints at her physical impairments is his statement, without more, that "[t]he conclusion that the claimant does not have a physical impairment or combination of physical impairments that significantly limits her ability to perform basic work activities is supported by the record as a whole." (Tr. at 17.) That comprises the entire analysis. This woeful offering "fails to build a logical bridge between the facts of the case and the outcome." *See Parker v. Astrue*, 597 F. 3d 920, 922 (7th Cir. 2010) (Posner, J.).

True, the objective medical evidence failed to uncover what caused her headaches and test results usually came back normal. (Tr. at 257, 266-68, 289.) Nor did she corral any medical opinions supporting disability. However, the doctors sometimes confirmed her tenderness, (Tr. at 265, 290-91, 295), restricted movement, (Tr. at 279, 291), decreased strength, (Tr. at 279), and MRI results showed protruding discs and an impinged thecal sac. (Tr. at 247.) Most importantly, the doctors earnestly attempted to diagnose her headaches and consistently employed relatively significant treatments. Dr. Sternberg, for example, listed various potential diagnoses and set about testing them. (Tr. at 299-301.) His diligence, and the continuing efforts of other physicians like Dr.

Mehrotra, provide cogent evidence that they thought something was wrong. She also received numerous cervical injections, (Tr. at 248, 292, 293, 295.), and prescriptions. (Tr. at 260, 262, 293, 306.) Plaintiff listed multiple other treatments she sought on her own: acupuncture, counseling, relaxation biofeedback, and atlas orthogonal treatment. (Tr. at 289.) The persistence of her physicians and the consistent treatment they provided–in what is admittedly a truncated medical record without anything from 2006 through most of 2011–at least nudges her claim past stage two.

The ALJ's only analysis in the decision was of Plaintiff's mental impairments, and this too was cursory. First, he noted psychologist opinions that it was non-severe. (Tr. at 16.) Those opinions came from a one-time examining psychologist and another who merely reviewed the first's assessment. (Tr. at 56-57, 66-67.) The analysis  Next, the ALJ found her only mildly limited in daily functions because she could clean, do laundry, drive, and shop. (Tr. at 17.) Numerous courts have counseled ALJs not to rely heavily on these quotidian factors in their analyses. *See, e.g.*, *Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008) ("It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment."). This warning would seem to apply with particular force when the ALJ employs daily activities at stage two to find non-severity.

Moreover, the ALJ attributed her with more daily vigor than the record supports. In fact, she said she walked slowly and that her mother helped with cooking, cleaning, shopping, and the laundry. (Tr. at 224-25.) She only drove "some," she added. (Tr. at 225.) Also, she sobbed throughout the hearing; instead of recognizing that this could indicate problems with social functioning, the ALJ seemed perturbed by it at the hearing and his decision–"you've been crying and sniffling and having trouble . . . maintaining control of your emotions" since the hearing

began, he observed, (Tr. at 38), later noting in his opinion twice that she cried "for no apparent reason." (Tr. at 13, 16.) Yet, because she could talk to her sister once per month and retail clerks, the ALJ concluded she was only mildly limited in social functioning. (Tr. at 17, 274.) Before concluding, he jotted a few other factors–poor work history (which is a surprising inclusion given her multiple attempts to work in the disability period), no psychiatric hospitalizations, inconsistent medication use, and no episodes of decompensation. (Tr. at 16-17.)

The evidence of depression and mental issues is not substantial, but is enough to satisfy the Court that her claim is not groundless. She reported trying counseling in the past, (Tr. at 273, 289), and she repeatedly reported irritability and depression. (Tr. at 259, 300, 308, 313-14.) She used anti-depressants for a significant period, and her doctors frequently adjusted her medications. (Tr. at 308, 313-14.) She admitted to Dr. Benton that she had suicidal thoughts and had attempted to kill herself in the past. (Tr. at 274.) Dr. Benton concluded that her depression was chronic and moderate, (Tr. at 275), but the ALJ fails to mention that conclusion in his description, let alone his analysis. (Tr. at 15, 16-17.) Thus he neglected to analyze her opinion under the balancing test in 20 C.F.R. §§ 404.1527(c), 416.927(c), requiring ALJs to consider various factors when assessing medical opinions. Nor did he mention that the consulting physician, Dr. Tas, thought Plaintiff's depression was severe and required treatment, remarking it was more critical to her health than her back pain. (Tr. at 279.)

In short, the ALJ's decision lacks sufficient analysis and ignores evidence contrary to its conclusion. Plaintiff's case may not be strong, but she proved enough to move past stage two.

### G.      Conclusion

I recommend reversing the ALJ's decision and remanding for further proceedings. During those proceedings, the ALJ should also consider the potential *res judicata* effect of the three prior determinations

the record mentions: Plaintiff testified that she applied in 2003 and 2005, (Tr. at 40-41), her representative's pre-hearing brief attached the initial denial notice of the 2005 claim, (Tr. at 245), the 2011 internal determination documents list the 2005 claim, (Tr. at 64, 76), and agency documents also list a 2008 initial determination denying benefits. (Tr. at 199.) The ALJ made no mention of these in his decision.

These determinations likely trigger the *res judicata* doctrine, which binds adjudicators to "adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law. . . ." Acquiescence Ruling ("AR") 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998) (acquiescing to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997)). The doctrine of *res judicata* applies to initial determinations even when an ALJ never subsequently considers them. *Drummond*, 126 F.3d at 841 (citing *Draper v. Sullivan*, 899 F.2d 1127, 1130 (11th Cir. 1990)). *See also Knight v. Comm'r of Soc. Sec.*, 198 F.3d 246, 1999 WL 1111513, at *3 (6th Cir. 1999) (unpublished table decision) (applying doctrine to reconsideration after initial determination); *Domozik v. Cohen*, 413 F.2d 5, 8 (3d Cir. 1969) ("[T]he 'res judicata' principle has been applied even where no hearing had been held on the prior claim . . . ."). The determination is final and binding unless the Commissioner reconsiders it upon request or decides to revise it later. 20 C.F.R. §§ 404.905, 416.1405.

The potential analysis here would likely address whether the ALJ's present decision could constructively reopen the prior decisions–there are time limits suggesting it could not. *See Glazer v. Comm'r of Soc. Sec.*, 92 F. App'x 312, 315 (6th Cir. 2004) In any case, the record leaves too much

out to construct the requisite analysis here. But the ALJ on remand should augment the record and analyze this issue.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 31, 2014                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge


### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  October 31, 2014          By____s/*Jean L. Broucek*_____
                                           Case Manager to Magistrate Judge Morris